1

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2

3                    Judge Erik P. Kimball

4

5    In Re:

6                          Case No. 08-22222-BKC-EPK

7    RICHARD S KRUGMAN and
     TAMARA B. GIORDANO,
8
              Debtors.
9    _____

10   DEBORAH MENOTTE,
              Plaintiff,
11
     vs.                    Case No. 08-1870-BKC-EPK
12
     KRUGMAN,
13            Defendant.
     _____

14

15   ORAL RULING RE: TRIAL, COMPLAINT BY DEBORAH MENOTTE
     AGAINST RICHARD S. KRUGMAN (1)(36)
16

17

18                          May 14, 2009

19

20   The above entitled cause came on for hearing before
     the HONORABLE ERIK P. KIMBALL, one of the Judges in
21   the UNITED STATES BANKRUPTCY COURT, in and for the
     SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler
22   Drive, West Palm Beach, Palm Beach County, Florida, on
     May 14th, 2009, commencing on or about 2:00 p.m., and
23   the following proceedings were had:

24
          Reported by: Jacquelyn Ann Jones, Court Reporter
25

2

```
 1
      APPEARANCES:
 2

 3    RUDEN MCCLOSKY
      By: MICHAEL R. BAKST, ESQUIRE
 4    On behalf of Trustee Deborah Menotte

 5
      ERIC ROSEN, P.A.
 6    By: ERIC A. ROSEN, ESQUIRE
      On behalf of the Debtors
 7    (Appearing telephonically)

 8
      Also Present:
 9
      Deborah Menotte
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1              THE COURT:  Anybody on the telephone?

2              MR. ROSEN:  Your Honor, Eric Rosen on the

3    telephone, for the debtor.

4              THE COURT:  Good afternoon, Mr. Rosen.  And

5    Mr. Bakst and Ms. Menotte are here in the courtroom.

6    Is it just you on the phone, Mr. Rosen?

7              MR. ROSEN:  Yes, it is.

8              THE COURT:  Can you hear me clearly enough,

9    because you're very soft?

10             MR. ROSEN:  I can hear you clearly.  Is that

11   better now?

12             THE COURT:  Yes.  This is for a ruling, so

13   you don't need to speak very much.  I just want to

14   make sure everybody can hear me.

15             In my usual manner, this is a fairly long

16   ruling, so just to give you some forewarning.

17             We're here today in the joint Chapter 7 case

18   of Richard Krugman and Tamara Giordano in Case No.

19   08-22222.  The purpose of today's hearing is for me to

20   rule in connection with an adversary proceeding filed

21   by the trustee requesting denial of discharge.  That's

22   Case No. 08-1870, and also in connection with the

23   trustee's objection to exemptions in the main case,

24   which is docket entry 36.

25             The following oral ruling constitutes my

Ouellette & Mauldin Court Reporters  (305)358-8875

4

1   findings of fact and conclusions of law in both

2   matters, consistent with Bankruptcy Rule 7052.  I will

3   enter a separate judgment in the adversary proceeding

4   and a separate order in the main case addressing

5   docket entry 36, and each document will incorporate

6   this oral ruling.

7          In the end you will find that I will deny

8   the discharge in this case, and I will also enter an

9   order substantially sustaining the trustee's

10  objections to exemptions.

11          I held an evidentiary hearing addressing

12  both matters on April 24, 2009, which was continued to

13  and concluded on May 4, 2009.  At the evidentiary

14  hearing I heard testimony from both debtors, from

15  Deborah Menotte, the Chapter 7 trustee, from a

16  representative of Addison Storage where certain assets

17  of the debtors were stored before and after the filing

18  of this case, and from the debtors' appraiser.  I also

19  admitted a number of documentary exhibits offered by

20  the debtors and the trustee.

21          The trustee's adversary proceeding complaint

22  seeks denial of discharge for both debtors under

23  multiple subsections of Section 727.  As the basis for

24  relief the trustee cites 727(a)(2)(B), 727(a)(3),

25  727(a)(4)(A), 727(a)(4)(D) and 727(a)(5).

1       In her objection to exemptions the trustee

2    seeks denial of certain claimed exemptions on the

3    grounds that the debtors claim such exemptions in bad

4    faith, and seeks turnover of the subject property.

5    The trustee claims that certain other property claimed

6    as exempt is undervalued in the debtors' schedules,

7    and the trustee seeks turnover of such property for

8    administration by the trustee, with a value claimed as

9    exempt to be returned to the debtors.

10       Lastly, the trustee seeks turnover of a set

11    of golf clubs that were not listed on the debtors'

12    schedules and were not claimed as exempt.

13       Under Bankruptcy Rule 4005 the trustee bears

14    the burden of proof on its objection to discharge

15    under Section 727.  Bankruptcy Rule 4003(c) provides

16    that the trustee bears the burden of proof in

17    connection with her objections to exemptions.  The

18    evidentiary standard in both matters is preponderance

19    of the evidence.

20       I first address allegations of concealment

21    triggering denial of discharge under Section

22    727(a)(2)(B).  The debtors' schedules show that all of

23    the personal property addressed in this ruling is

24    owned jointly.

25       Under Section 727(a)(2)(B) a Court shall

6

1    grant the debtor a discharge unless the debtor, within

2    intent to hinder, delay, or defraud a creditor or an

3    officer of the estate charged with custody of property

4    under this title, has transferred, removed, destroyed,

5    mutilated, or concealed, or has permitted to be

6    transferred, removed, destroyed, mutilated or

7    concealed, property of the estate after the date of

8    the filing of the petition.

9            This provision requires the Court to

10   determine whether there was actual fraudulent intent

11   on the part of the debtor.  Since it is unlikely that

12   a debtor will admit that he or she intended to hinder,

13   delay or defraud creditors, a debtor's intent may be

14   established by circumstantial evidence or inferred

15   from the debtor's conduct -- course of conduct.

16           For this proposition I refer you to the 2008

17   11th Circuit decision in Jennings versus Maxfield, In

18   Re Jennings, found at 533 F 3d. 1333, at page 1339.

19           The present case was filed August 27, 2008.

20   The trustee alleges that the debtors concealed the

21   following assets after the date of the filing of the

22   petition in this case.

23           A Royal Dalton china set, a silverware set,

24   a set of Waterford crystal glasses, a Lalique leaf

25   bowl, a Lalique caviar bowl, a lady's Rolex

1    wristwatch, presidential model, 18 carat yellow gold

2    with single cut diamonds, a silver bangle bracelet, a

3    gold wedding band with diamonds, platinum hoop

4    earrings with pave diamonds, a gold woman's ring with

5    a blue stone, a man's Swiss Army diving watch.

6            A football helmet, a football, and a shoe,

7    signed by the place kicker for the Philadelphia

8    Eagles.  These items were referred to on the record as

9    supports memorabilia.

10            Two lithographs by George Rodrigue, signed

11   and numbered, identified on the record as the Blue Dog

12   lithographs.  A second set of golf clubs, in addition

13   to that listed in the debtors' schedules, a mattress,

14   two tables lamps and a small table, and some Gucci and

15   Luis Vuitton handbags.

16            The trustee presented substantial evidence

17   at trial in connection with her allegations of

18   concealment.

19            Prior to the filing of this case the debtors

20   maintained two storage units at Addison Storage.  The

21   units were number 2222 and number 2220, and they were

22   next to one another.

23            While unit 2222 is referenced in the

24   debtors' schedules, the debtors consolidated the

25   contents of the two storage units into unit 2220 prior

1    to filing this case.  Thus at the time the case was

2    filed, the debtors had one storage unit at Addison

3    Storage, unit 2220.

4           The trustee offered testimony of Daniel

5    Frost, a manager with Addison Storage, regarding

6    activity by the debtors at Addison Storage and in the

7    two storage units.  During his testimony Mr. Frost

8    referred to activity logs maintained by Addison

9    Storage.  These activity logs were admitted as Exhibit

10   14.

11          Mr. Krugman had only one account with

12   Addison Storage and he had a single code for access to

13   the Addison Storage building.  The activity log shows

14   each time his code was used to enter the building.

15   The activity log also shows activity within the

16   storage units themselves, as each unit has a motion

17   sensor, and movement in a unit is reflected in the

18   log.  Thus by reference to the activity log, one can

19   see when Mr. Krugman visited Addison Storage and which

20   unit he entered.

21          Based on the activity log, testimony of Mr.

22   Frost, and the testimony of Mr. Krugman himself, Mr.

23   Krugman spent many hours in the storage units during

24   the period from the month before the filing of this

25   case, through the day after this case was filed.

9

1    There was considerable activity in the days prior

2    to the petition date, and I mean in the two days prior

3    to the petition date.

4           Although he had assistance in consolidating

5    the two storage units, Mr. Krugman confirmed that he

6    took part in moving all the items from unit 2222 into

7    unit 2220.  He stated that this was completed either

8    the day prior to or the day of the filing of the

9    petition.

10          I note that this testimony was contrary to

11   the debtors' response to a request for admissions

12   served by the trustee, wherein the debtors stated that

13   they had not been in the storage unit for at least

14   three years prior to the filing of the petition.

15          Mr. Krugman testified that one reason why

16   the debtors failed to amend their schedules to include

17   various items of personal property addressed at trial,

18   is because they do not now have access to the storage

19   unit in order to obtain the necessary information.  I

20   did not find this testimony credible.

21          It is clear from the evidence presented, and

22   the testimony of both debtors, that they knew of each

23   item addressed at trial and had no need to review the

24   items in the storage unit in order to properly amend

25   their schedules.

1            This is an appropriate point to address the

2     credibility of Mr. Krugman and Ms. Giordano.  In

3     general Mr. Krugman was not a credible witness.  He

4     was evasive, particularly in responding to questions

5     regarding the values ascribed to assets listed in the

6     debtors' schedules.  His testimony with regard to his

7     knowledge of items contained in the storage unit, and

8     otherwise subject to the trustee's claims of

9     concealment, was simply not believable.  Some of his

10    testimony appeared rehearsed.  I did not find him a

11    convincing witness, and his lack of credibility

12    colored all of his testimony.

13           Likewise, Ms. Giordano lacked credibility.

14    For example, she testified that she thought simply

15    listing the storage unit itself on her schedules was

16    sufficient disclosure of the contents of the storage

17    unit.  Her demeanor on the stand led me to believe

18    that she was not being honest.  Some of her testimony

19    also appeared rehearsed.  I found her testimony was

20    not reliable.

21           I note that Ms. Giordano's statement, that

22    she believed listing only the storage unit itself was

23    sufficient disclosure, is belied by the fact that the

24    debtors' original schedules listed some of the items

25    contained in the storage unit.  It makes no sense that

11

1    the debtors listed certain, mostly lesser valued items

2    from the storage unit in their schedules, but left out

3    other potentially more valuable items.

4              Indeed, the debtors listed a specific number

5    of framed diplomas in the storage unit, 15, and a

6    specific number of framed posters, six, but failed

7    to remember more valuable items of art.  This lends

8    to the conclusion the debtors were intentionally

9    concealing assets.

10             The trustee alleges that the debtors own two

11   lithographs by artist George Rodrigue, from his Blue

12   Dog series, and that the debtors concealed these

13   assets.  These pieces of art were referred to during

14   the trial alternatively as paintings and lithographs.

15   Although there was some dispute as to the form of

16   these artworks, in an e-mail admitted as part of

17   Exhibit K, Mr. Krugman called them lithos, which I

18   take to mean lithographs.

19             When asked why the debtors failed to list

20   certain items on their schedules, including the Blue

21   Dog lithographs, Mr. Krugman responded that to the

22   debtors, these items had no value.  Mr. Krugman

23   testified that the lithographs were souvenirs from a

24   trip to New Orleans, they had no meaning to him, they

25   were always stored in closets or garages.

12

1    For purposes of Section 727, the debtors'

2  perceived value of their assets is not material.  The

3  debtors are required to disclose all assets, even if

4  worthless.

5    It is clear in any case that these

6  lithographs have some value.  The trustee testified

7  that both lithographs were signed and numbered, one

8  item 6 in a series of 15, and the other item 17 of a

9  series of 50.  Exhibit 15, admitted at trial, includes

10  a photograph of a Rodrigue lithograph that the trustee

11  testified is the same as one of the lithographs found

12  in the debtors' storage unit.

13    The trustee testified that the subject

14  lithograph was offered for sale at $7,500.  Mr.

15  Krugman testified that none of these art dealers

16  wanted the Blue Dog lithographs.  Only a few moments

17  later he testified that he did not realize they owned

18  the Blue Dog lithographs anymore.  How did he know

19  that none of their art dealers wanted these pieces if

20  he did not remember he had them.

21    This testimony is even less credible in

22  light of the fact that Mr. Krugman was involved in

23  moving items from one storage unit to the other in the

24  days prior to the filing of this case.

25    The trustee testified that the Blue Dog

Ouellette & Mauldin Court Reporters  (305)358-8875

13

1    lithographs were along the wall of the storage unit

2    with other artwork, including artwork listed in the

3    debtors' schedules.  She testified that the Blue Dog

4    lithographs were large, 3 to 4 feet across, and they

5    were not wrapped, but were loosely covered.  Mr.

6    Krugman himself testified that he relocated the Blue

7    Dog lithographs within the storage unit the day prior

8    to filing this case.

9            In spite of his protestations, it is obvious

10   that Mr. Krugman knew the debtors owned the Blue Dog

11   lithographs.  I find that Mr. Krugman actively

12   concealed the Blue Dog lithographs.  This alone is

13   sufficient to support denial of Mr. Krugman's

14   discharge under Section 727(a)(2)(B).

15           The debtors' original schedules did not

16   include the Royal Dalton china, silverware, Lalique

17   items, and Waterford glasses.  The trustee visited the

18   debtors' storage unit twice, once on the same day that

19   she inspected the debtors' residence, and again at a

20   later date.

21           During her first visit to the debtors'

22   storage unit the trustee asked Mr. Krugman if the

23   debtors had any china or silver.  When he answered

24   that they did, the trustee told Mr. Krugman that the

25   debtors needed to amend their schedules.  Mr. Krugman

1   testified that the debtors amended their schedules

2   immediately after that meeting.

3          The trustee did not inspect every box in the

4   storage unit on her first visit.  However, it is

5   apparent that she was led to believe that the china,

6   silverware, Lalique pieces and Waterford glasses were

7   in the storage unit.

8          When the trustee returned for a second visit

9   to the storage unit and inspected each box, she did

10  not find these items.  At that time Mr. Krugman told

11  her that they were, "under the kitchen sink."  This

12  statement only reinforces the cavalier manner in which

13  the debtors have approached this case.

14         By the way, I believe that the trustee

15  actually visited the storage unit a third time in

16  addition to the two that I referenced in this

17  ruling.

18         At trial Mr. Krugman testified that the

19  china, silverware, Lalique items, and Waterford

20  glasses were at the debtors' home.  These items have

21  yet to be shown to the trustee.

22         Ms. Giordano testified that the china,

23  silverware, Lalique and Waterford were never used,

24  that they had been in storage and moved from house to

25  house for 15 years, and that the debtors' failure to

1   list them was an oversight.  This testimony was not

2   credible.  Ms. Giordano's repeated use of the word,

3   oversight, seemed Rehearsed.

4           These items were not in the storage unit

5   when the trustee inspected it post-petition during her

6   second visit.  If these items were in the storage unit

7   previously, then one of the debtors moved them to the

8   debtors' home.  If this is the case, based on the

9   activity logs admitted into evidence, this was likely

10  either around the time the case was filed, or after

11  the trustee's first visit to the storage unit.  In

12  either case the debtors would have been aware of these

13  items and should have disclosed them without the need

14  for the trustee to ask.

15          If instead, these items were never in the

16  storage unit and were at the debtors' current

17  residence, it is hard to believe that the debtors

18  overlooked them.

19          Based on the debtors' testimony with regard

20  to their rent for former homes, and their current rent

21  as shown in their schedules, the debtors now live in a

22  much more modest home, and so the trustee testified.

23  Nearly all of their furniture is rented.  One would

24  think they would be keenly aware of higher value

25  items, particularly as they moved into their most

1    recent home relatively recently.

2         Based on the evidence presented, I find that

3    both debtors intentionally concealed the china,

4    silverware, Lalique items, and Waterford glasses.  The

5    fact that the debtors disclosed the china, silverware

6    and Lalique items and Waterford after the trustee

7    specifically asked about them, does not negate the

8    fact that they concealed them.  This finding alone is

9    sufficient to support denial of Mr. Krugman's and Ms.

10   Giordano's discharge under Section 727(a)(2)(B).

11        The debtors' schedules as originally filed

12   disclosed only three items of jewelry.  The debtors

13   assigned an aggregate value of $150 to these items.

14   This disclosure was woefully inadequate.

15        Mr. Krugman testified that the debtors were

16   not in the mindset to list all of the jewelry on their

17   initial schedules.  He said he was either stupid or in

18   a frame of mind that the world was coming down upon

19   him, and he could not answer any of the questions

20   asked of him.  He testified at the time he believed

21   the schedules showed all of their jewelry.  This was

22   completely unbelievable.

23        Ms. Giordano testified that the jewelry not

24   originally disclosed was, to her, like items of

25   clothing.  She said she did not understand that the

Ouellette & Mauldin Court Reporters  (305)358-8875

17

1    jewelry was personal property that needed to be

2    listed.  In testimony that appeared rehearsed, she

3    said the failure to list the debtors' other jewelry

4    was an omission.

5          This was in spite of the fact that schedule

6    B, item 7, specifically request that the debtors list,

7    "furs and jewelry", and the debtors disclosed a small

8    portion of their jewelry on their original

9    schedules.

10          After the trustee visited the debtors at

11    their home, and found a number of items of jewelry in

12    plain sight, including a ladies Rolex watch, which I

13    will address shortly, the debtors amended their

14    schedules to include these items.  The debtors'

15    amended schedules show an aggregate value of $5,740

16    for jewelry, a substantial increase from the $150

17    shown on their original schedules.  They had three

18    items of jewelry on their original schedules.  They

19    now have nine items.

20          The testimony of both debtors on this issue

21    is, frankly, amazing.  By their own admission, the

22    debtors failed to disclose $5,590 of jewelry on their

23    initial schedules.  Many of these items were visible

24    in the debtors' home when the trustee visited them,

25    leading me to the conclusion that they were in

1    everyday use.

2            There is absolutely no reason why the

3    debtors failed to disclose all of their jewelry, other

4    than to conceal it from the trustee and this Court.

5    This finding alone is sufficient to support denial of

6    Mr. Krugman's and Ms. Giordano's discharge under

7    Section 727(a)(2)(B).

8            Ms. Giordano owned a ladies Rolex

9    wristwatch, all 18 carat gold with diamonds.  It is

10   the presidential model.  The debtors' Exhibit MM, an

11   appraisal, valued this watch at $3,000.  This watch

12   was not disclosed on the debtors' original schedules

13   in this case.

14           The trustee testified that she visited the

15   debtors' home for the purpose of conducting

16   inspection.  Her counsel accompanied her.  When they

17   first arrived at the debtors' home, no one answered

18   the door.  They waited in the neighborhood.

19           When they saw Mr. Krugman come home, they

20   rang the doorbell.  The trustee heard dogs barking.

21   The debtors' dogs and Ms. Giordano were in an office

22   adjacent to the front door.  The trustee introduced

23   herself.  This was prior to the Section 341 meeting of

24   creditors, and thus the debtors had not met the

25   trustee.

19

1        Mr. Krugman allowed the trustee and her

2   counsel to inspect the home.  The trustee saw some

3   jewelry on a dresser in the bedroom.  She saw a Swiss

4   Army brand watch by the nightstand.  She saw a small

5   safe that was not locked.

6        The trustee testified that she asked Mr.

7   Krugman about Ms. Giordano's watch, and Mr. Krugman

8   told the trustee that his wife had a Swiss Army brand

9   watch.

10       They then proceeded from the bedroom to the

11  living area.  The trustee wanted to look into the

12  office near the front door.  Ms. Giordano went to

13  remove the debtors' three dogs from the office to the

14  back yard.  The trustee testified that as Ms. Giordano

15  passed the trustee, the trustee saw a gold band on Ms.

16  Giordano's wrist.

17       The trustee and her counsel then inspected

18  the debtors' home office.  The trustee asked Mr.

19  Krugman where Ms. Giordano might keep her watch.  The

20  trustee testified that upon hearing this question, Mr.

21  Krugman slid open the back door and asked Ms. Giordano

22  where she kept her Swiss Army watch.

23       When Ms. Giordano came back in, she was not

24  wearing a watch.  The trustee testified that she asked

25  Ms. Giordano what happened to the watch Ms. Giordano

1    was wearing on her wrist when Ms. Giordano went into

2    the backyard.

3          The trustee testified that Ms. Giordano

4    pulled a Rolex watch out of her pocket and began to

5    cry.  When the trustee asked if there was anything

6    else the trustee had not seen, Ms. Giordano showed the

7    trustee a diamond wedding ring and another ring.

8          Then the trustee, her counsel, and Mr.

9    Krugman, departed to visit the storage unit.

10          Both debtors testified that Ms. Giordano

11    regularly removes her jewelry when she takes the dogs

12    out.  This testimony was not credible.  It is obvious

13    that Ms. Giordano removed her valuable wristwatch in

14    an attempt to hide it from the trustee.

15          It is also obvious that Mr. Krugman assisted

16    her in this effort.  Mr. Krugman responded to the

17    trustee's question about where Ms. Giordano kept her

18    watch by mentioning only a Swiss Army watch and

19    failing to mention Ms. Giordano's Rolex.  Then when

20    asked where Ms. Giordano kept her watch, Mr. Krugman

21    called to Ms. Giordano asking about the whereabouts of

22    her Swiss Army watch in an apparent attempt to remind

23    Ms. Giordano to hide her Rolex.

24          Even without this incident, it is impossible

25    to believe that the debtors simply forgot to list an

1    item as valuable as a gold Rolex watch, that is

2    apparently worn by Ms. Giordano on a daily basis.

3            I find that both debtors acted to conceal

4    the Rolex watch, first by failing to disclose it in

5    their schedules, and again by attempting to hide it

6    from the trustee during her inspection of their home.

7    This finding alone is sufficient to support denial of

8    Mr. Krugman's and Ms. Giordano's discharge under

9    Section 727(a)(2)(B).

10            There was evidence regarding the concealment

11   of several other articles of personal property.  The

12   debtors own potentially valuable sports memorabilia

13   consisting of a football helmet, football and shoes

14   signed by the place kicker for the Philadelphia

15   Eagles.  These items have never been listed on the

16   debtors' schedules.

17            There was no evidence regarding the value of

18   these items.  They were given to the debtors in

19   recognition of the debtors' efforts in assisting a

20   charity organization.  Surely they have some value in

21   the marketplace.

22            The debtors tried to downplay their failure

23   to disclose these items.  Mr. Krugman testified that

24   they did not consider it supports memorabilia, and

25   that neither of them is an Eagles fan.  Ms. Giordano

1    testified that they simply forgot about it.  Their

2    testimony consistently lacked credibility, and thus I

3    did not believe these statements.

4         On their schedules the debtors stated that

5    all of their household furnishings were rented.  This

6    is untrue.  The debtors own a mattress, two table

7    lamps, and a small table.

8         Dr. Krugman confirmed that these items were

9    removed from the storage unit a month prior to the

10   filing of this case.  They must have been unique among

11   the debtors' household furnishings, as they were the

12   only items actually owned by the debtors, yet the

13   debtors failed to disclose these items in their

14   schedules.  The debtors tried to downplay the value of

15   these items.

16        The debtors also failed to disclose Gucci

17   and Luis Vuitton handbags.  Again, the debtors

18   downplayed the value of these items, testifying that

19   they had been in storage for the greater part of 15

20   years, and that the debtors did not open boxes when

21   they moved from place to place.  Nevertheless the

22   debtors never amended their schedules to include these

23   items.

24        The debtors owned a second set of golf

25   clubs.  Mr. Krugman testified that these golf clubs

1   are eight to nine years old, and that he damaged them

2   by running into them with his car in the garage.

3   These golf clubs are not included in the debtors'

4   schedules.

5          The evidence presented in connection with

6   the sports memorabilia, household furnishings,

7   handbags and golf clubs, is not individually

8   sufficient to merit a finding under Section

9   727(a)(2)(B).  However, in light of the testimony of

10  both debtors, which consistently lacked credibility,

11  and in light of the sheer weight of the other evidence

12  of concealment in this case, it is very likely that

13  the debtors concealed these assets as well.

14         The failure to disclose these items is

15  emblematic of the debtors' apparent disdain for their

16  duties as debtors before this Court.

17         Under Section 727(a)(4)(A), the Court will

18  grant the debtor a discharge unless, "the debtor

19  knowingly and fraudulently, in or in connection with

20  the case, made a false oath or account".

21         In a 1991 decision, Swicegood versus Ginn,

22  the 11th Circuit stated, "To justify denial of

23  discharge under Section 727(a)(4)(A), the false oath

24  must be fraudulent and material".  This can be found

25  at 924 Fed 2d 230 at page 232.

24

1            The 11th Circuit provided additional

2    guidance in its 1984 decision, In Re Chalik,

3    C-h-a-l-i-k.  The Court stated, "The subject matter

4    of a false oath is material and thus sufficient to bar

5    discharge, if it bears a relationship to the

6    bankrupt's business transactions or estate, or

7    concerns the discovery of assets, business dealings,

8    or the existence and disposition of its property".

9            "The recalcitrant debtor may not escape a

10   727(a)(4)(A) denial of discharge by asserting that the

11   admittedly omitted or falsely stated information

12   concerned a worthless business relationship or

13   holding:  such a defense is specious.  It makes no

14   difference that he does not intend to injure his

15   creditors when he makes a false statement.  Creditors

16   are entitled to judge for themselves what will

17   benefit, and what will prejudice, them.  The veracity

18   of the bankrupt's statements is essential to the

19   successful administration of the bankruptcy act".

20   This quote can be found in 748 Fed 2d 616 at page 618.

21           Deliberate omissions by the debtor may also

22   result in the denial of a discharge.  False oaths

23   regarding worthless assets can still bar discharge of

24   debt.

25           The debtors' signed their schedules and

Ouellette & Mauldin Court Reporters  (305)358-8875

25

1   statement of financial affairs under oath.  They

2   reaffirmed the accuracy of their schedules and

3   statement of financial affairs during their Section

4   341 meeting of creditors, also under oath.

5          In my analysis of concealment under Section

6   727(a)(2)(B), I addressed a number of items that the

7   debtors failed to disclose in their schedules and

8   statement of financial affairs.  Each failure to

9   disclose a concealed item also constitutes a false

10  oath.

11         In addition to the items previously

12  discussed, the debtors failed to disclose the

13  following in their schedules and/or their statement of

14  financial affairs.

15         Income of 5 to $10,000 per month from Mr.

16  Krugman's mother, which should have been disclosed on

17  the statement of financial affairs.  The debtors'

18  Schedule I references a gift from Mr. Krugman's

19  mother, which appears to have been a one time event.

20         Mr. Krugman testified that the debtors

21  received regular income from his mother for the prior

22  one and a half to two years.  This was not disclosed

23  in their filings.

24         The sale of AT&T stock in March 2007 for

25  approximately $11,900, and the sale of other stock in

Ouellette & Mauldin Court Reporters  (305)358-8875

1    2007, all of which should have been disclosed on their

2    statement of financial affairs.

3            I note that the debtors prepared and filed

4    their 2007 tax return just prior to filing this case.

5    That tax return discloses the sale of stock.  Given

6    the timing of preparation and filing of that return,

7    the debtors should have been well aware of the income

8    from the sale of the stock, and the same should have

9    been disclosed in their papers.

10            One or more trust accounts established by

11    Mr. Krugman's mother for Mr. Krugman's benefit, which

12    should have been listed on the debtors' schedules.

13            Multiple payments to Zo Diamonds, apparently

14    a pawn broker, within the two years prior to the

15    filing of this case, which should have been disclosed

16    in the statement of financial affairs.

17            I find that each debtor knowingly and

18    fraudulently failed to disclose assets on their

19    schedules, and failed to answer truthfully and

20    completely the questions posed in the statement of

21    financial affairs.  It is obvious that these failures

22    materially affected the administration of this case,

23    and the trustee so testified.  Thus the false oaths

24    were material.

25            These failures constitute multiple false

1    oaths for each of the debtors under Section

2    727(a)(4)(A).

3            The trustee alleges that the debtors failed

4    to copy and/or preserve relevant documentation in

5    violation of Section 727(a)(3).  Section 727(a)(3)

6    provides that a debtor's discharge will be disallowed

7    where the debtor has failed to keep or preserve any

8    recorded information, including books, documents,

9    records and papers, from which the debtor's financial

10   condition or business transactions might be

11   ascertained, unless such act or failure to act was

12   justified under all of the circumstances of the

13   case.

14           The purpose of Section 727(a)(3) is to

15   ensure that the trustee and creditors receive

16   sufficient information to trace a debtor's financial

17   history for a reasonable period past to present.

18   Neither the trustee nor the creditors is required to

19   ferret out the required records.  It is the debtor's

20   duty to maintain and provide the Court with organized

21   records of its financial dealings.

22           In examining the sufficiency of the

23   information provided by debtors, this Court can

24   consider, among other things, the sophistication of

25   the debtors and the complexity of the transactions in

1    which the debtors engaged.

2         With respect to the time period that such

3    financial information encompasses, the plain language

4    of Section 727(a)(3) does not specify a time period

5    for which the duty to maintain records exists prior

6    to the filing of a bankruptcy petition.

7         For purposes of Section 727(a)(3), the

8    relevant time period is one that extends a reasonable

9    period in the past so that the debtor's financial

10   history may be ascertained.

11        A reasonable period under this section

12   varies on a case by case basis, but is understood to

13   encompass at least a two year period prior to the

14   filing of the bankruptcy petition.  I emphasize that

15   the two year period is a starting point, not an ending

16   point, for the Court's proper analysis.

17        There is authority from the Middle District

18   of Florida for the proposition that the plaintiff, the

19   trustee in this case, must not only demonstrate that a

20   debtor has failed to keep records, but that the debtor

21   failed to keep records for a purpose, namely to avoid

22   having to surrender such records for discovery to a

23   suspicious trustee.

24        You will find this in Judge Funk's 2002

25   decision in Salfi versus Prevatt at 261 BR 54, at page

29

1    58.  This contrary authority was rejected by Judge

2    Hyman in his case, In Re Hahn, a 2007 decision found

3    at 362 Bankruptcy Reporter 542.

4         I choose to follow Judge Hyman and the

5    reasoning in Hahn.  As Judge Hyman observed in Hahn,

6    "The ability to keep records necessary to ascertain a

7    debtor's personal or business transactions is normally

8    fully within the control of a debtor.  It would be

9    inequitable to grant a discharge to a debtor, who by

10   his or her own action or inaction, regardless of

11   whether an intent to defraud existed, has

12   unjustifiably failed to keep records from which the

13   trustee can determine a debtor's financial

14   condition".

15        The trustee alleges that the debtors failed

16   to maintain sufficient records in connection with a

17   2006 transaction involving the jewelry.

18        In July 2006, approximately 25 months before

19   the debtors filed their Chapter 7 case, the debtors

20   pawned a number of items of jewelry to Zo Diamonds on

21   Glades Road in Boca Raton.  The items pawned

22   comprised, a Tiffany gold and platinum necklace with

23   diamonds; a women's 5.02 carat diamond ring; a

24   platinum ring; women's diamond earrings, 2.25 carats

25   each; a pocket watch; a men's Breitling watch; a men's

1    Panerai watch; and other men's watches, including a

2    gold presidential Rolex.

3            Mr. Krugman testified that Zo Diamonds

4    loaned the debtors $130,000, and charged a monthly,

5    vig, v-i-g, meaning monthly interest payments, of

6    $6,000 per month.

7            Mr. Krugman testified that he did not know

8    how the principal was to be repaid, and that Zo

9    Diamonds kept a possessory interest in the jewelry as

10   collateral in the event of a missed payment.  Mr.

11   Krugman testified that the debtors made five or six

12   payments to Zo Diamonds, in cash, before defaulting on

13   the loan.

14           Mr. Krugman stated that the $130,000

15   transaction with Zo Diamonds was not documented.

16   Ms. Giordano also testified that the debtors received

17   $130,000 in cash for the jewelry.  She testified that

18   they did not attempt to obtain documentation for this

19   transaction.

20           The debtors' testimony that there was no

21   documentation for this transaction was not credible.

22   Under Florida law pawn brokers must provide each

23   pledgor with a pawn broker transaction form,

24   reflecting, among other things, the amount of money

25   advanced.  Florida Statute Section 539.001 was in

1    effect at the time of the alleged transaction.

2          Given the amount of money at issue, and the

3    fact that the transaction was only 25 months prior to

4    the filing of this case, it is reasonable to require

5    the debtors to provide documentation of the sale.  The

6    debtors failed to provide any credible evidence of the

7    price at which they sold their jewelry.

8          Accordingly, with regard to the July 2006

9    transaction involving the debtors' jewelry, I find

10   that the debtors failed to maintain sufficient records

11   in violation of Section 727(a)(3), and that this

12   merits denial of discharge.

13         The trustee alleges that the debtors have

14   incurred substantial liabilities to unsecured

15   creditors in excess of 2.3 million dollars, but that

16   the debtors cannot explain satisfactorily substantial

17   losses of assets that could have been used to meet

18   these liabilities in violation of Section 727(a)(5).

19         Pursuant to Section 727(a)(5) a Court shall

20   grant a debtor a discharge unless the debtor has

21   failed to explain satisfactorily any loss of assets or

22   deficiency of assets to meet the debtors

23   liabilities.

24         To meet her burden the trustee must

25   establish that the debtor at one time owned a

1    substantial identifiable asset, not too remote in time

2    to the date of the commencement of the case, that on

3    the date of filing the voluntary petition the debtor

4    no longer had the particular asset.

5            A Court's review of lost assets is commonly

6    focused on the two year period prior to the petition

7    date, but inquiries beyond the two year period may be

8    warranted.  If the trustee meets her burden, the

9    burden shifts to the debtors to provide a satisfactory

10   explanation for the loss.

11           To be satisfactory an explanation must

12   convince the judge.  Vague and indefinite explanations

13   of losses that are based upon estimates uncorroborated

14   by documentation are unsatisfactory.

15           I refer you to the 11th Circuit 1984

16   decision In Re Chalik, which you can find at 748 F 2d

17   616, at page 619, addressing this issue.

18           The trustee alleges that the debtors failed

19   to provide satisfactory explanation for the use of

20   proceeds arising from a 2006 transaction involving

21   jewelry, a 2006 sale of artwork, and the 2005 sales of

22   certain real estate in Pennsylvania and Boca Raton,

23   Florida.

24           Because the debtors and the trustee treated

25   the jewelry and artwork together, I will do the

1    same.

2            I find it appropriate in this case to

3    consider the assets the debtors received from the sale

4    of their real property in 2005, although this was

5    about three years prior to the filing of the debtors'

6    petition.  I believe it is appropriate to look back to

7    those transactions in light of the magnitude of the

8    net proceeds, nearly 1 million dollars, and in light

9    of the fact that these debtors are sophisticated

10   business people.

11           Ms. Giordano testified that the debtors

12   received proceeds of $240,000 as a result of the

13   disposition of the jewelry and artwork in 2006.  She

14   also testified that they received $982,000 in proceeds

15   as a result of the real estate sales in 2005.

16           Ms. Giordano testified that from her review

17   of the debtors' financial records, the debtors can

18   account for 217,000 of the $240,000 received from the

19   sale of jewelry and artwork.

20           The expenditure of the remaining $23,000 is

21   not documented.  Ms. Giordano also testified that the

22   debtors can account for $941,000 of the $982,000 from

23   the sale of the real property.  The expenditure of the

24   remaining $41,000 is not documented.

25           With regard to the proceeds from the sale of

1    the real estate, the trustee testified that she could

2    track the expenditure of a slightly larger amount,

3    $958,000, leaving $24,000 unaccounted for.

4           Because the trustee relied on the smaller

5    figure, and it is in the debtors' favor, I used the

6    $24,000 figure in my analysis, rather than the $41,000

7    figure testified to by Ms. Giordano.

8           Thus, from the disposition of art, jewelry,

9    and real estate, the debtors received $47,000 that

10   they cannot show where these funds were spent.  The

11   only evidence on this point consists of Ms. Giordano's

12   testimony that these funds were used for personal

13   living expenses of the debtors.

14          I find that it is not reasonable for these

15   debtors to have no documentation at all to corroborate

16   their explanation.  Vague, indefinite, and

17   uncorroborated statements by a debtor do not

18   constitute satisfactory explanations for purposes of

19   Section 727(a)(5).

20          Ms. Giordano was the CFO of the debtors'

21   multi-state medical enterprise.  She has 15 years of

22   experience in the banking industry.  She admitted at

23   trial that the debtors co-mingled their personal

24   assets and the assets of their company.  The bank

25   records were hopelessly convoluted.  There were

1    transactions that appeared by the banking entries to

2    be between two parties, but according to Ms.

3    Giordano's testimony, were actually between two

4    different parties.  It was impossible to tell who was

5    sending and who was receiving money in these

6    transactions.

7              The evidence presented at trial leads me to

8    believe that it would be nearly impossible to

9    construct a logical view of the debtors' financial

10   transactions during the years leading up to the filing

11   of this case.

12             I've taken into account the sophistication

13   and financial experience of these two debtors.  Given

14   the complete lack of documentation to support the

15   debtors' uncorroborated explanation for the loss of

16   these funds, and considering the totality of the

17   circumstances of this case, including as I previously

18   noted, both debtors' lack of credibility during trial,

19   I find that the debtors have failed to provide a

20   satisfactory explanation of the loss of $47,000.

21             Accordingly, I find that this failure is in

22   violation of Section 727(a)(5), and that this merits

23   denial of discharge for both debtors.

24             In light of the overwhelming evidence

25   supporting denial of discharge already addressed in

1    this ruling, it is not necessary for me to address the

2    trustee's arguments under Section 727(a)(3) in

3    connection with the sale of artwork and the use of the

4    proceeds from the sale of jewelry, artwork, and real

5    estate.  Nor is it necessary for me to address the

6    trustee's arguments under 727(a)(4)(D).

7              For all of the foregoing reasons, I will

8    enter judgment denying the discharge of both debtors

9    in this case.

10              Now I turn to the trustee's objection to

11   exemptions.  In its 1982 decision, Doan versus

12   Hudgins, the 11th Circuit ruled that concealment of an

13   asset will bar exemption of that asset.  This decision

14   can be found at 672 Fed 2d 831.

15              I have found that the debtors concealed

16   certain assets.  Under the Doan case the debtors

17   exemption of such assets is denied.  Those assets are

18   as follows: Royal Dalton china set, a wedding

19   silverware set, Waterford crystal glasses, Lalique

20   leaf bowl, Lalique caviar bowl, woman's Rolex

21   wristwatch, 18 carat gold Presidential model with

22   diamonds, silver bangle bracelet, gold wedding band

23   with diamonds, platinum hoop earrings with pave

24   diamonds, gold woman's ring with blue stone, man's

25   Swiss Army diving watch.

37

1            Each of these items will be turned over

2     to the trustee for administration, and the debtors

3     will have no interest in any proceeds.

4            The trustee challenges the values assigned

5     by the debtors to certain other items of personal

6     property claimed as exempt.  They are as follows:  15

7     framed diplomas and certificates, six to eight garment

8     boxes, eight painting boxes from Ms. Giordano's

9     mother's apartment, six framed posters, one lithograph

10    by Leroy Nieman, one set of six year old golf clubs.

11           The framed diplomas and certificates of Mr.

12    Krugman are of no material value to the trustee and

13    will be retained by Mr. Krugman.

14           The trustee is authorized to examine the

15    contents of the six painting boxes from Ms. Giordano's

16    mother's apartment.  It is not apparent that these are

17    assets of the debtors.  If they are assets of the

18    debtors, they will be included with the auction I am

19    about to authorize.

20           The garment boxes, framed posters, Nieman

21    lithographs, golf clubs, and painting boxes shall be

22    subject to auction sale by the trustee to be conducted

23    at a reasonable time and place selected by the

24    trustee.

25           At such auction sale each of the debtors may

Ouellette & Mauldin Court Reporters  (305)358-8875

1   bid on these items, and if either of them is the

2   successful bidder, the relevant debtor may use

3   whatever portion of his or her dollar exemption rights

4   may be necessary to purchase the items.  In other

5   words, the trustee will allow the debtors, in an

6   auction situation, to decide which of these items the

7   debtors wish to keep within the dollar value

8   limitations set by the relevant Florida exemption

9   statutes.

10          The debtor shall take into account the other

11   property which they have claimed as exempt, which I

12   have not addressed today.

13          The debtors failed to disclose a second set

14   of golf clubs.  They are not claimed as exempt.  This

15   second set of golf clubs will be turned over to the

16   trustee for administration, and the debtors will have

17   no interest in any proceeds.

18          I will enter an order sustaining in part the

19   trustee's objection to the debtors' exemptions and

20   providing other relief consistent with this oral

21   ruling.

22          Any questions?

23          MS. MENOTTE:  The only question I would

24   have, Your Honor, I don't -- didn't hear the Blue Dog

25   lithographs being addressed in your objection to

1   exemption order.  I don't think they were because they

2   didn't --

3              THE COURT:  I don't think they were claimed

4   as exempt.

5              MR. BAKST:  Correct, they were not.  They

6   weren't claimed.

7              MS. MENOTTE:  I just wanted to make sure

8   they were going to be turned over as well.

9              THE COURT:  They will be turned over, yes.

10  Anything that was not claimed as exempt by the

11  debtors, is subject to administration.  I didn't think

12  I needed to actually say that.

13             But what I did is, I actually looked at the

14  exemptions claimed by the debtors, and I cross

15  referenced that with the items that I had addressed

16  earlier in my decision.  So what I'm saying is that

17  certain items claimed as exempt, which I have accepted

18  from the exemption as a result of my findings today,

19  need to be turned over.  All other non-exempt assets

20  obviously need to be turned over to the trustee.

21             MR. BAKST:  Thank you.

22             THE COURT:  Anything else?

23             MS. MENOTTE:  No, Your Honor.

24             THE COURT:  Mr. Rosen, you're still there I

25  hope.

Ouellette & Mauldin Court Reporters  (305)358-8875

```
 1            MR. ROSEN:  I'm here, Your Honor, I have no
 2   questions.  I do appreciate the depth of the decision.
 3   I understand everything you said.
 4            THE COURT:  And I acknowledge, Mr. Rosen,
 5   that you had a very difficult case here.
 6            MR. ROSEN:  It happens.
 7            Actually, I do have one question.  I just
 8   want to make sure I wrote everything down.  This is
 9   with respect to the auction that's going to go
10   forward.  The diplomas are being retained by the
11   debtors; correct?
12            THE COURT:  That's correct.
13            MR. ROSEN:  Okay.  But I think everything
14   else is being sold, that's the way I wrote it, with
15   the exception of the painting box, which is for Ms.
16   Menotte's inspection.
17            THE COURT:  Keep in mind that when I was
18   going through that list, I was focusing on the items
19   that were claimed as exempt.
20            MR. ROSEN:  I got it.
21            THE COURT:  And my goal there was to provide
22   the debtors with, in effect, the ability to do the
23   equivalent of credit bidding.
24            MR. ROSEN:  Yes, I understood that.  I just
25   wanted to make sure I wrote it all down accurately,
```

1    because I couldn't hardly keep up.

2              I understand it, and I'm sure if there's an

3    issue it will all be worked out.

4              THE COURT:  Rather than my usual extremely

5    brief order, when it comes to the exemption issue and

6    ruling on docket entry 36, I'm going to list each of

7    those same items in the order, so that it will be

8    obvious.  Otherwise, you have to rely on your note

9    taking, and I realize that's an issue.

10             MR. ROSEN:  No one wants to do that.

11             MR. BAKST:  Thank you.

12             MR. ROSEN:  Thank you very much, Your

13   Honor.

14             MS. MENOTTE:  Thank you, Your Honor.

15             (The proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

42

```
 1              .
 2                    C E R T I F I C A T E
 3
 4   The State of Florida      )
 5   County of Palm Beach      )
 6
 7              I, JACQUELYN ANN JONES, Court Reporter,
 8   certify that I was authorized to and did
 9   stenographically report the foregoing hearing; and
10   that the transcript is a true record of my
11   stenographic notes.
12              I further certify that I am not a relative,
13   employee, attorney or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorney or counsel connected with the action, nor am
16   I financially interested in the action.
17
18              In witness whereof I have hereunto set my
19   hand and seal this  2nd  day of  June, 2009.
20
21                          _____
22                          JACQUELYN JONES
23                          Commission DD 846540
24                          Expires Feb 18, 2013
25
```